# United States Bankruptcy Court
# District of Massachusetts

|  |  |
|---|---|
| In re: | ) |
|  | ) Chapter 7 |
| GARY P. MALLOWS, | ) Case No. 05-41632-HJB |
|  | ) |
| Debtor. | ) |
|  | ) |

## MEMORANDUM OF DECISION

Before the Court is the "Trustee's Objection to Claim of the Bank of Western Massachusetts and Request for Disgorgement of Overpayment" (the "Objection"). The Objection is filed by Steven Weiss, the Chapter 7 trustee (the "Trustee") of Gary P. Mallows (the "Debtor"). The Bank of Western Massachusetts (the "Bank") opposes.[1] At first blush, resolution of the dispute appears to require the interpretation of pre-petition agreements between the Bank, the Debtor and his non-debtor spouse Valerie E. Mallows ("Valerie"). Upon further consideration, however, this Court rules that the issues are circumscribed by a post-petition stipulation filed by the Trustee with the same parties. Employing the doctrine of *res judicata*, this Court holds that the Trustee is precluded from raising his objection to the Bank's claim.

---

[1] Typically, an objection to a claim together with a request for recovery of money or property, or with a proceeding to determine the validity or extent of a lien in property, ought to be brought through an adversary proceeding. See Fed. R. Bankr. P. 3007 and 7001. However, during the hearing on the Objection, the Bank expressly agreed to allow the Trustee to proceed on his Objection as a contested matter in the main bankruptcy case.

I.  **FACTS & TRAVEL OF THE CASE**

The material facts are uncontested and are largely based on a "Stipulation of Facts" filed by the Trustee and the Bank.

In November of 1993, the Debtor and Valerie obtained a home equity line of credit from the Bank, secured by a second mortgage (the "Longmeadow Mortgage") on the Debtor's residence (the "Residence"), located at 108 Ely Way, Longmeadow, Massachusetts, and on an adjacent undeveloped lot (the "Lot"). The Longmeadow Mortgage secured payment only of the home equity line and not any of the Debtor's other obligations to the Bank.

On September 9, 1999, the Debtor and Valerie granted to the Bank an open-end commercial mortgage in condominium units numbered 4 and 9 (respectively, "Unit 4" and "Unit 9") located at 12 Shetucket Trail in Old Saybrook, Connecticut (the "Old Saybrook Mortgage"). The Old Saybrook Mortgage secured the payment of various promissory notes individually executed by the Debtor in favor of the Bank, as well as the obligations of Chelsea Graphics, Inc. (the "Chelsea Graphics Guaranty") that the Debtor had personally guaranteed to the Bank . By its terms, however, the Old Saybrook Mortgage was limited to "only the principal sum of Ninety Thousand and 00/100 ($90,000.00) Dollars" of the Chelsea Graphics Guaranty. Furthermore, the mortgage provided that "Valerie. . . shall have no personal, individual liability [t]hereunder except to the extent of her undivided one-half ownership interests and rights in and to the Premises." And the mortgage provided that it should be construed in accordance with Massachusetts law.

Some time later, the Debtor and Valerie defaulted on their obligations to the Bank. In response, the Bank demanded immediate payment. On April 5, 2004, however, the

-2-

Debtor, Valerie and the Bank executed a forbearance agreement (the "Forbearance Agreement"),[2] the text of which explains:

> [The Debtor] and [Valerie] have requested that the Bank forbear from pursuing its rights and remedies under the Loan Documents, at law and in equity. The Bank has agreed to the requested forbearance from further pursuing and exercising its rights and remedies, but only in reliance upon the undertakings, representations and warranties of [the Debtor and Valerie] which are included or referred to in this Agreement and in the documents, instruments and agreements executed herewith and upon the following terms and conditions.

The Forbearance Agreement then sets forth the various amounts that the Debtor and, in some cases, Valerie then owed to the Bank and the basis for each obligation (collectively the "Obligations"). The Obligations included a calculation of the Chelsea Graphics Guaranty, set forth as:

| | |
|---|---|
| Principal: | $130,914.35 |
| Interest: | $31,501.21 |
| Late Charges: | $8,866.07 |
| TOTAL: | $171,281.63 |
| | Current Per Diem Interest Accrual: $19.09 |

Immediately following the list of the Obligations, the Forbearance Agreement provided: "[The Debtor] and [Valerie] specifically acknowledge and agree that the Obligations are secured, liquidated and uncontested." But specifically with respect to the Old Saybrook Mortgage, the Forbearance Agreement further provided, in relevant part:

> 3. <u>Additional Collateral</u>: As part of the consideration for the Bank's forbearance, and as a condition precedent thereto, [the Debtor and Valerie] acknowledge and agree that the Old Saybrook Mortgage secures the Obligations except that no more than $90,000.00 of the amounts due

---

[2] The Forbearance Agreement states that it "shall be governed by and construed in accordance with the law of the Commonwealth of Massachusetts."

-3-

pursuant to the Chelsea Graphics Guaranty and the Chelsea Products Guaranty shall be charged against [Valerie's] one-half equity in the Old Saybrook Premises. . .

Accordingly, the Forbearance Agreement effected some degree of change to the Bank's security. Whereas, before execution of the Forbearance Agreement, the Old Saybrook Mortgage collateralized only $90,000.00 of liability for both the Debtor and Valerie, under the Forbearance Agreement only Valerie's interest in the condominium units was so limited. The Forbearance Agreement was, however, never recorded at the applicable registry of deeds.

On March 23, 2005, the Debtor filed his petition for relief under Chapter 7 of the Bankruptcy Code.[3] Soon thereafter, the Trustee received court approval to sell the Lot. Although objections to that sale had been filed by the Bank and by Page & Ross Nominee Trust ("P&R"), holders of a disputed mortgage, those objections were later withdrawn. On July 13, 2005, the Trustee filed a motion to sell Unit 4. At the hearing on that sale, held on July 27, 2005, the Trustee acknowledged that, while the sale proceeds were more than sufficient to pay the first and second mortgages on that Unit,[4] a dispute with the Bank had arisen relative to the amount that should be paid to the Bank out of the remaining proceeds. That dispute was further complicated by a request by the Debtor and Valerie for an advance on the Debtor's exemption, a request that the Trustee supported as likely

---

[3] Unless otherwise stated, all statutory references are to Title 11 of the United States Code, §§ 101 *et seq.* (the "Bankruptcy Code" or the "Code").

[4] The Debtor's Schedule D does not state which is the first and which is the second mortgage, but it represents that Fleet Bank, now the Bank of America, held a mortgage on Units 4 and 9 in the amount of $12,500.00 and that Liberty Bank Mortgage Corporation held a $179,295.09 mortgage in that same property. It is uncontested that these mortgagees have priority over that of the Bank in any event.

-4-

to facilitate the sale of the remaining properties.[5] The Trustee reported at the hearing, however, that a stipulation agreement with the Bank would be forthcoming.

Several days later, on August 4, 2006, the Trustee filed the "Stipulation Concerning Distribution of Proceeds from Sales of Properties" (the "Sale Stipulation") in conjunction with an expedited motion to approve the same (the "Motion to Approve"). The Sale Stipulation appeared to resolve of a number of problems. It acknowledged, *inter alia:*

>   1. the Bank held claims against the Debtor and Valerie in the aggregate amount of $362,461.49 (as of July 27, 2005), "secured by *mortgages on all of the properties . . , subject also to the terms of a forbearance agreement between [the Debtor], Valery and the Bank dated April 5, 2004;*"
>
>   2. the Trustee had sold or intended to sell . . . the . . . properties, at the following prices: Lot 3, $380,107.00; the Residence, $950,000.00; Unit 4, $550,000.00; and Unit 9, $276,000.00 . . .; and
>
>   3. "[t]here may be a number of issues and controversies concerning the allocation of the proceeds from the sale, *including, without limitation*, the extent to which the Debtor's exemption applies to Lot 3; the validity of [P&R's] mortgage; and application of the equitable doctrine of marshaling *and other issues.*"

(Emphases supplied).

In settlement of these various issues, the Sale Stipulation went on to provide:

>   1. Unit 4 would be sold with the consent of all parties and after payment of the first and second mortgages (owed to others), condominium fees and related charges, the remaining proceeds would be paid in the following order: $50,000.00 to the Debtor as an advance on his homestead exemption, and

---

[5] Because the Debtor and Valerie were in the midst of dealing with the sales of their home (and lot) and the condominium units, they faced significant expenses associated with their own move, in addition to the removal of their personal property from the Old Saybrook condominium units.

-5-

    then payment of the Bank's secured claim "in accordance with its mortgage and the foreclosure agreement," the Bank having subordinated its mortgage to the Debtor's advance on his exemption; and

2. the Residence would be sold with the consent of all parties and, after payment of an undisputed first mortgage and associated closing costs and commissions, the remaining proceeds would be paid in the following order: the first $50,000.00 to the Trustee, which would otherwise have gone to the Debtor as part of his homestead exemption; $110,000.00[6] to be escrowed for any payments ultimately found due on the disputed second mortgage to Page and Ross Nominee Trust;[7] and the balance to the Bank as "payment in full of its remaining claim, if any."

Finally, the parties noted in the Sale Stipulation:

> The Debtor, Valerie, and the Trustee recognize that this is an interim stipulation concerning the allocation of the proceeds from the sale; that this is not a complete resolution of the claims amongst them; and that this stipulation is without prejudice to any claims that the Trustee, the Debtor or Valerie, may have in this case, without exception.

The hearing on the Motion to Approve was held on August 24, 2005. The Trustee recounted to the Court the benefits of the settlement set forth in the Sale Stipulation and further explained the impediments which the estate would have faced had the settlement not been reached, including: 1) Valerie's co-ownership rights in all the properties and her

---

[6] The Court later increased this amount to $125,000.00.

[7] It is undisputed that the Residence and the Lot were subject to a first mortgage in the amount of $510,654.00 held by United Bank. However, the Page & Ross Nominee Trust ("P&R") was the holder of a disputed claim, secured by a second mortgage on the Residence and the Lot. P&R's claim that it was owed $108,000.00 was denied by the Hampden County Superior Court prior to the filing of the Debtor's bankruptcy petition, but P&R appealed and that appeal was pending at the time that the Sale Stipulation was executed. The Bank was the holder of a third mortgage in those properties. The Sale Stipulation provided for a portion the proceeds from the sale of the Residence to be held in escrow, pending the outcome of the P&R appeal, to protect the Debtor and Valerie should the Superior Court decision be reversed and the P&R claim deemed valid.

claim to a share of the sale proceeds, 2) the necessary moving expenses associated with the sales, 3) marshaling issues, insofar as the Trustee wanted to pay the Bank out of the proceeds of the sale of the Residence and the Lot, but the Debtor wanted the Bank paid from the proceeds of the sales of the Old Saybrook condominiums, 4) the disputed P&R mortgage claim, and 5) the existence of a judicial lien that was attached to Valerie's interest in the Old Saybrook property. Convinced that the Trustee had demonstrated that the Sale Stipulation was in the best interests of the both the estate and other impacted parties, the Court approved the Sale Stipulation, after hearing from counsel for the Debtor, Valerie, the Bank, and P&R, in addition to the Trustee.

The Trustee proceeded to liquidate the four subject properties, with the last of the sales finalized on October 21, 2005. The Bank was paid in full in the sum of $388,282.40 - in part from the proceeds of the sales of Units 4 and 9 and in part from the proceeds of the sale of the Residence. But, at some point after that payment the Trustee apparently realized that the Forbearance Agreement had never been recorded in the applicable registry of deeds. Pursuant to the instant Objection, the Trustee seeks repayment of $96,122.03 from the Bank, monies for which the Trustee says the Bank was not secured and to which it is not entitled.

## II.   POSITIONS OF THE PARTIES

The Trustee maintains that the Chelsea Graphics Guaranty was secured by the Old Saybrook properties only and limited to the sum of $90,000.00. He argues that the Bank may not rely on the terms of the Forbearance Agreement to have expanded the collateral

-7-

base for that debt to the Residence or beyond the original $90,000.00 cap set forth in the Old Saybrook mortgage for two reasons.

First, the Trustee asserts that the terms of the Forbearance Agreement are ambiguous and the agreement "does not unequivocally modify the [Old Saybrook] Mortgage in the fashion that the Bank suggests. . . Nowhere does the Forbearance Agreement expressly provide that the [Old Saybrook] Mortgage is being modified." During the hearing on the Objection, the Trustee contended that:

> At most, it may be interpreted. . . to deal with an allocation issue. . . [as to] what part of the Chelsea Graphics Guaranty debt came out [of] [Debtor's] portion of the property or [Valerie's] portion of the property.

The Trustee asserts that the Forbearance Agreement does not unambiguously expand the original $90,000.00 cap on the security for payment of the Chelsea Graphics Guaranty.

The second, and more fundamental, issue raised by the Trustee is the fact that the Forbearance Agreement was never recorded in the appropriate land records. The Trustee argues that under both Connecticut and Massachusetts law, an unrecorded forbearance agreement is not enforceable against third party creditors. He asserts that "the Forbearance Agreement is not effective as against the Debtor's creditors and by extension, the Trustee, holding the rights of a lien creditor without notice, 11 U.S.C. § 544." It is the Trustee's position that where a mortgage is later modified, "Massachusetts state courts and this Court have consistently held that terms of the recorded instrument are controlling."[8] Accordingly, he asserts that the Bank is only secured to the extent provided in the recorded

---

[8] In support of this asseveration, the Trustee cites In re Moran, 163 B.R. 11 (Bankr. D. Mass. 1994) and Chiodetti v. First Lake Corp. (In re Chiodetti), 163 B.R. 6 (Bankr. D. Mass. 1994). The Trustee also cites a Connecticut case, Rosenbluth v. The Deforest and Hotchkiss Co., 85 Conn. 40 (Conn. Sup. Ct. 1911), for the same proposition.

-8-

mortgage documents, specifically, by the terms of the Old Saybrook Mortgage.[9] The Debtor and Valerie support the Trustee's views.

In response, the Bank maintains that the Old Saybrook Mortgage must be read in conjunction with the Forbearance Agreement because "documents which are in essence part of one transaction must be read together to effectuate the intentions of the parties, even if not all documents are incorporated into a single agreement."[10] Moreover, the Bank puts the onus of the failure to record the Forbearance Agreement on the Debtor and Valerie, reminding the Court that the agreement provides:

> To the extent necessary, [the Debtor] and [Valerie] shall execute and deliver a clarification or modification of the Old Saybrook Mortgage in compliance with this section of the Agreement.

The Bank maintains that, because Debtor and Valerie did not do what the Forbearance Agreement required, "the Debtor may not now be permitted to rely for disgorgement upon the absence of the very documents that he promised to execute and deliver."

Alternatively, the Bank contends that the Trustee waived his right to object to its secured claim by entering into the Sale Stipulation, which provided for payment "in full" of the Bank's "claim." The Bank contends, and the Trustee does not disagree, that the Trustee had all the relevant agreements, such as the Mortgages and the Forbearance Agreement, in his possession during the negotiations that precipitated the formation of the

---

[9] During oral argument on the Objection to the Bank's claim, the Trustee brought up the choice-of-law provision in the Old Saybrook Mortgage as a potential dispute and, as a result, was invited to brief the Court on which laws to apply. In his supplemental brief, the Trustee did not take a firm position as to which state's law should govern, but simply analyzed his argument under both Massachusetts and Connecticut law; the outcome, according to the Trustee, being the same under each.

[10] Quoting Chase Comm. Corp. v. Owen, 32 Mass.App.Ct. 248, 250 (1992).

Sale Stipulation which was drafted by the Trustee. The Bank asserts that it had maintained, during negotiations with the Trustee, the Debtor and Valerie, that the Forbearance Agreement modified the Old Saybrook Mortgage. The Bank further argues that it was forthcoming about its concern that the $90,000.00 limit on Valerie's liability for the Chelsea Graphics Guaranty not interfere with full payment of the Bank's fully secured claim and that this concern was addressed and resolved by the Sale Stipulation. The Bank maintains that this Court's allowance of the Motion to Approve the Sale Stipulation was a final order, to which the Trustee is now bound, and cites in support the case of Micro Control Sys., Inc. v. Cadkey Corp. (In re Cadkey), 324 B.R. 424 (D. Mass. 2005).

### III. DISCUSSION

To the extent that a resolution of the issues here requires the application of state law, Massachusetts law controls. The Old Saybrook Mortgage, the Forbearance Agreement, and the Sale Stipulation require as much.

Under Connecticut law, parties to a contract may select which law will govern their agreement, unless either:

> (a) the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice, or
> (b) application of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue. . .

Elgar v. Elgar, 238 Conn. 839, 850, 679 A.2d 937 (1996) (citations omitted). Massachusetts courts are likewise amenable to allowing contracting parties to select the law to govern their agreement. Newburyport Five Cents Sav. Bank v. MacDonald, 48 Mass.App.Ct. 904, 906, 718 N.E.2d 404 (1999) (citing, inter alia, Morris v. Watsco, Inc.,

-10-

385 Mass. 672, 674, 433 N.E.2d 886 (1982)); Stagecoach Transp., Inc. v. Shuttle, Inc., 50 Mass.App.Ct. 812, 817-18, 741 N.E.2d 862 (2001) ("[c]hoice of law and forum selection provisions are routinely enforced in the Commonwealth, if enforcement if fair and reasonable") (citations omitted); see also, G.L. c. 106, § 1-105(1) ("when a transaction bears a reasonable relation to this state and also to another state [] the parties may agree that the law either of this state or of such other state [] shall govern their rights and duties"). This Court is satisfied that the choice-of-law provision in each of the respective agreements is enforceable and that the law of the Commonwealth of Massachusetts controls.

Under Massachusetts law, where the terms of a contract are unambiguous, the interpretation of that contract is for the court to decide as a matter of law. Nadherny v. Roseland Prop. Co., Inc., 390 F.3d 44, 48 (1st. Cir. 2004). Similarly, the question of whether a term is ambiguous at all is a question of law for the Court. Id. "A term is ambiguous only if it is susceptible of more than one meaning and reasonably intelligent persons would differ as to which meaning is the proper one." Citation Ins. Co. v. Gomez, 426 Mass. 379, 381, 688 N.E.2d 951 (1998). Courts have cautioned that "[w]ords that are clear and unambiguous, by themselves, may be ambiguous when read in the context of the entire [] contract, or as applied to the subject matter." Jefferson Ins. Co. v. Holyoke, 23 Mass.App.Ct. 472, 477, 50 N.E.2d 474 (1987). For this reason, it has been articulated that "words matter; but the words are to be read as elements in a practical working document and not a crossword puzzle." Fleet Nat'l Bank v. H&D Entm't, Inc., 96 F.3d 532, 538 (1st Cir. 1996).

This Court finds substantial ambiguity in the operative documents. It is hardly clear whether the collateral provided under the Old Saybrook Mortgage was intended to be

modified by the terms of the Forbearance Agreement. While the Forbearance Agreement beings with the language: "This is a *Modification Agreement*. . . between [t]he Bank. . . ; Gary P. Mallows. . . ; and Valerie E. Mallows. . ." (emphasis added), the acknowledgment exacted by the Bank from the Debtor and Valerie - to the effect that the various obligations due to the Bank were "secured, liquidated and uncontested" - begs the question as to exactly what served as collateral. Did the parties intend that the pre-existing collateral suffice for each associated debt, or did the parties intend that the debt be consolidated, with the Old Saybrook Mortgage securing payment for the whole of the Obligations?

In fact, even the title of Paragraph 3, which sets forth the "<u>Additional Collateral</u>" provided under the Forbearance Agreement, raises the question of what the parties meant by the term "additional." By that word did they mean only to distinguish the collateral represented by Units 4 and 9 of the Old Saybrook condominiums from the Residence, but without change in the rights of the parties before execution of the Forbearance Agreement, or did they mean that the Bank's security interest would be more extensive than before? On none of these points is the Forbearance Agreement a model of clarity. Were these questions dispositive of the Trustee's Objection, an evidentiary hearing would be critical.

The Trustee contends that the Court need not engage in this inquiry. He maintains that the ambiguities in the Forbearance Agreement, if any, are immaterial because, as estate representative, he may avoid any negative consequences of that agreement. He reminds the Court that in Massachusetts:

> A conveyance of an estate. . . shall not be valid as against any person, except the grantor.. . and persons having actual notice of it unless it. . . is recorded in the registry of deeds for the county or district in which the land to which it relates lies.

-12-

G.L. c. 183, § 4.[11]

The Bank counters that several commercial documents relating to one transaction, whether or not recorded, should be read together to determine the intentions and obligations of the parties thereto. However, the cases cited by the Bank relate to disputes between the contracting parties and are inapplicable to the rights of third parties. See, e.g., Kattar v. Demoulas, 433 Mass. 1, 739 N.E.2d 246 (2000) (dispute between mortgagor and mortgagee over enforcement of an oral modification to mortgage); Chase Comm. Corp. v. Owen, 32 Mass.App.Ct. 248, 588 N.E.2d 705 (1992) (action brought by lender against the debtor to enforce personal guarantees not contained in the security agreement). Relying on Massachusetts common law, bankruptcy courts in this district have held that a mortgagor's obligations to a mortgagee are to be determined by the recorded documents. See Chiodetti v. First Lake Corp. (In re Chiodetti), 163 B.R. 6, 10-11 (Bankr. D. Mass. 1994) ("Massachusetts law permits an interpretation of the mortgage alone to discover the intention of the parties and the extent of the security").

The Trustee might have persuaded the Court that the Forbearance Agreement was never intended to improve the Bank's collateral position. Perhaps not. The Trustee might have persuaded the Court to ignore any modification effected by the unrecorded Forbearance Agreement, in light of the Trustee's powers under § 544 of the Code.

---

[11] The laws of the state of Connecticut are no different:

> No conveyance shall be effectual to hold any land against any other person but the grantor and his heirs, unless recorded on the records of the town in which the land lies.

Conn. Gen. Stat. § 47-10.

-13-

Perhaps not. It is all hypothetical. Any and all disputes by and between the Trustee and the Bank were *settled*.

Settlement agreements are especially desirable in bankruptcy cases as a means to avoid the litigation of claims which would otherwise be unduly costly and therefore detrimental to the bankruptcy estate. See Mailman Steam Carpet Cleaning Corp. v. Salem (In re Mailman Steam Carpet Cleaning), 212 F.3d 632, 635 (1st Cir. 2000) (citing, inter alia, Collier on Bankruptcy, ¶ 9019-2 (15th ed. 1995)). More important, a court approved settlement constitutes a final judgment on the merits. Petitioning Creditors of Melon Produce, Inc. v. Braunstein (In re Melon Produce), 112 F.3d 1232, 1240 (1st Cir. 1997). "The finality of court-approved settlements. . . is important, especially to the efficient administration of the estate and to reassure settling parties that the trustee will not relitigate the settled claims." Id. (citing Medomak Canning v. Bayside Enter., Inc. (In re Medomak Canning), 922 F.2d 895, 902 (1st Cir. 1990)).

Because the allowance of the Sale Stipulation constituted a final judgment on the merits, the doctrine of *res judicata* applies. In re Medomak Canning, 922 F.2d at 900 ("[g]enerally, a court-approved settlement receives the same *res judicata* effect as a litigated judgment). The First Circuit has articulated three factors that are required to establish claim preclusion: (1) a final judgment on the merits in an earlier action; (2) an identity of the parties or privies in the two suits; and (3) an identity of the cause of action in both suits. Grella v. Salem Five Cents Sav. Bank, 42 F.3d 26, 30 (1st Cir. 1994) (citation omitted). Those factors have been distilled into the following rule: "Under *res judicata*, a final judgment on the merits of an action precludes the parties or their privies from

-14-

relitigating issues that were *or could have been raised* in [a prior] action." In re Melon Produce, 112 F.3d at 1240 (citing Allen v. McCurry, 449 U.S. 90, 94 (1980)) (emphasis supplied).

The Motion to Approve the Sale Stipulation and the Objection relate to the same parties. As noted, a settlement constitutes a final judgment. The only remaining question is whether the Bank's security interest in the Chelsea Graphics Guaranty "could have been raised" in the proceedings that resulted in the execution and final approval of the Sale Stipulation. This Court finds that it could, and *should*, have been raised. At the hearing on the Sale Stipulation, the Trustee informed the Court that the proceeds of the sale would be paid to the Bank in accordance with the Sale Stipulation. This Court was given no indication by any of the parties, at any time prior to and including the hearing on the Motion to Approve the Sale Stipulation, that the Trustee doubted or might later dispute the Bank's entitlement to payment pursuant to the terms of the Old Saybrook Mortgage, as modified by the Forbearance Agreement.

The Trustee was in the throes of attempting to sell the Debtor's interests in the four pieces of property when he filed his Motion to Approve the Sale Stipulation. The Trustee had the information, with respect to the Bank's security interest in the Chelsea Graphics Guaranty, at his disposal at all times. There exist no allegations of subsequent conduct or information, not readily discoverable at the time of the Sale Stipulation approval, that would bar the application of *res judicata*. Compare, Gonzalez-Pina v. Rodriguez, 407 F.3d 425, 430 (1st Cir. 2005) (new allegations of employment discrimination, occurring subsequent to settlement of other employment discrimination claims, were not barred by *res judicata*). There is no indication of fraudulent conduct on the part of the Bank, nor of

-15-

any mutual mistake, in connection with the agreement that led to the execution of the Sale Stipulation.

The Trustee simply did not reserve his right in the Sale Stipulation to pursue claims against the Bank.[12] Indeed, reference to the Bank is conspicuously absent from the section of the Sale Stipulation that preserves any claims for the Trustee against other parties.

> The *Debtor, Valerie, and the Trustee* recognize that this is an interim stipulation concerning the allocation of proceeds from the sale; that this is not a complete resolution of the claims amongst them; and that this stipulation is without prejudice to any claims that the Trustee, the Debtor or Valerie, may have in this case, without exception.

(Emphasis supplied). And in the Motion to Approve, the Trustee states only that "[t]he Stipulation is without prejudice to the Trustee's rights to assert any other claims *against the Debtor or Valerie.*" (Emphasis supplied). Accordingly, the Trustee's Objection is now barred by the doctrine of *res judicata*. The Debtor and Valerie, whose counsel also signed the same Sale Stipulation, are similarly bound.

## IV.  CONCLUSION

This Court has, on more than one occasion, noted the tremendous burden which the Bankruptcy Code places on trustees in bankruptcy. In re CK Liquidation Corp., 321 B.R. 10, 14 (Bankr. D. Mass. 2005), *rev'd on other grounds*, 2006 WL 1217268 (D. Mass. Mar 27, 2006); DiStefano v. Stern, et al. (In re J.F.D Enter., Inc.), 223 B.R. 610, 627-28 (Bankr. D. Mass. 1998). In light of those difficulties, where a trustee is not certain that he

---

[12] At the hearing on the Objection, the Trustee claimed to have reserved his rights against the Bank at the time the final payment was made. By that time, long after approval of the Sale Stipulation, it was too late to reserve rights against the Bank.

or she has determined the rights of other parties, the trustee should be loathe to definitively concede those rights. Wherever possible, the estate's rights should be preserved. The Trustee did not do so here.

It is not entirely apparent, however, that the Trustee's actions have occasioned a loss for the estate. Had it been allowed to proceed, the outcome of the Trustee's Objection was less than certain. And further, even with the knowledge of the Trustee's current arguments, this Court would have been inclined to approve the Sale Stipulation in light of the other obstacles noted by the Trustee in connection with his effort to liquidate this complicated estate. But what is certain is that it is now too late to go over old ground.

For the foregoing reasons, the Trustee's Objection to Claim of the Bank of Western Massachusetts is OVERRULED and his Request for Disgorgement of Overpayment is DENIED.

DATED: June 16, 2006                By the Court,

                                    /s/ Henry J. Boroff
                                    Henry J. Boroff
                                    United States Bankruptcy Judge

# United States Bankruptcy Court
# District of Massachusetts

| | |
|---|---|
| In re: ) | |
| ) | Chapter 7 |
| GARY P. MALLOWS, ) | Case No. 05-41632-HJB |
| ) | |
| Debtor. ) | |

## ORDER

For the reasons set forth in this Court's Memorandum of Decision of even date, the "Trustee's Objection to Claim of the Bank of Western Massachusetts and Request for Disgorgement of Overpayment" is DENIED.

DATED: June 16, 2006                    By the Court,

_____
Henry J. Boroff
United States Bankruptcy Judge